TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-02-00598-CV







Carlos Smith and Bobbie Hinojosa Smith, Appellants



v.



Texas Department of Protective and Regulatory Services, Appellee








FROM THE DISTRICT COURT OF LLANO COUNTY, 33RD JUDICIAL DISTRICT

NO. 12,634, HONORABLE GUILFORD L. JONES, III, JUDGE PRESIDING





M E M O R A N D U M O P I N I O N




 Carlos and Bobbie Hinojosa Smith appeal the trial court's judgment terminating their
parental rights to their children. By four issues, they challenge the factual sufficiency of the evidence
to support the judgment. We hold that although the evidence is factually insufficient to support some
of the grounds for termination alleged by the Department, factually sufficient evidence exists to
establish that the Smiths engaged in a course of conduct that endangered their children and that
termination was in the best interest of the children. We therefore overrule their issues and affirm the
judgment.


BACKGROUND


Bobbie Hinojosa Smith

 Bobbie Hinojosa Smith is the biological mother of the five children who are the
subjects of this case, S.R.H., C.C.S., C.A.S., C.L.S., and C.R.S. Bobbie started using marihuana at
the age of eleven. Since then, Bobbie testified that she has used other drugs, such as cocaine,
methamphetamine, and heroin. By the time she was in sixth grade, she quit school. She left home
and began living alone and supporting herself at age twelve. At age thirteen, Bobbie met and started
dating Carlos Smith and Darrell Slaughter at about the same time. When Bobbie was fourteen, she
gave birth to her first child, S.R.H., a daughter born in June 1992. Darrell Slaughter is S.R.H.'s
biological father; whether he was aware of his paternity is disputed. Bobbie worked at a nursing
home to support herself and her daughter, while her mother and sister cared for S.R.H. About a year
later, at the age of fifteen, Bobbie moved in with Carlos; he was twenty-five at the time. Bobbie and
Carlos conceived two children while they were living together, a daughter, C.C.S., and a son, C.A.S. 
The couple married on August 29, 1999, and had two more daughters afterwards, C.L.S. and C.R.S. 
Bobbie had a tubal ligation after the birth of her fifth child. The family eventually moved into a
manufactured home on five acres of land outside of Llano. Bobbie held various jobs at different
times to help support the family, sometimes working two jobs, while her husband or his sister cared
for the children.

 Bobbie testified that she has been arrested four or five times; two of those arrests were
drug related, another was for assault. At the time of trial, she was on probation for possession of a
controlled substance, cocaine; her probation ends in 2004. She testified that she is not currently
using drugs, has never used drugs with Carlos Smith, and has never been addicted to drugs. She
further testified that she submitted to a random urinalysis test conducted by her probation officer in
July 2002 (just before the trial) and tested clean. Bobbie testified that although she is not currently
using drugs, she is willing to voluntarily commit herself to a drug rehabilitation facility to secure the
return of her children. Bobbie also has a history of suffering from depression. On several occasions,
she has had to seek medical treatment and has been prescribed anti-depressants. 


Carlos Smith

 Carlos Smith has two daughters--ages fifteen and nine at the time of trial--in
addition to the four children he has with Bobbie. The oldest of the two was living with Carlos and
Bobbie at the time of trial. Carlos also helped support and raise Bobbie's oldest daughter, S.R.H. 
Carlos testified he was convicted for driving while intoxicated when he was eighteen years old (he
was thirty-five years old at the time of trial); he successfully completed probation for that conviction. 
He further testified that "nine years ago" (about 1993), he was convicted of delivering
methamphetamine and marihuana. At the time, he and Bobbie had no children together. At the time
of trial, Carlos was into his ninth year of a ten-year probation sentence, resulting from the delivery
of a controlled substance conviction. He had another fourteen months left to complete his probation. 
Carlos has had no other criminal arrests. 

 In 1996, Carlos tested positive for marihuana; consequently, he agreed to a voluntary
modification of his probation and was committed to a substance abuse felony punishment facility
(SAFPF) for nine months. Upon completion of his nine months in SAFPF, Carlos spent ninety days
in a halfway house before returning home.

 In October 2000, Carlos again tested positive for drugs. He had four children living
with him and Bobbie at the time. He agreed to another voluntary modification of his probation and
was committed first to the Llano County jail until February 2001, when a space became available
and he was able to move to an intermediate sanction facility, where he received drug counseling. 
He testified he has not used any drugs since then. In fact, he stated that he has been in recovery for
several years, and his last incarceration was the result of a relapse during his recovery. He also
testified that he never used drugs around the children or with Bobbie.

 In October 2001, after the Department removed his children from the home, Carlos
requested and was granted an early release from the intermediate sanction facility following a court
hearing. Carlos was instructed to repair his home and instead of paying child support, he was to use
his money to fund those repairs, so that the children could be returned to him. When not
incarcerated, Carlos has held various jobs to support the family.


The children

 S.R.H. is the oldest child. Her biological father is Darrell Slaughter, but she was
raised by Carlos most of her life. She was born in June 1992 and was ten years old at the time of
trial. S.R.H. was born with a non-cancerous tumor between her eyes. She also suffers from very
poor eyesight. She is otherwise physically healthy. When she was about seven or eight years old,
S.R.H. was sexually abused by her maternal grandmother's boyfriend. When Bobbie found out, she
filed charges with the police and took S.R.H. to a children's advocacy center to be interviewed and
to receive counseling. The Department was not involved at the time.

 C.C.S. was born in March 1995 and was seven years old at the time of trial. She is
a healthy child and suffers from no special problems. C.A.S., a son, was born a year later in March
1996; he was six at the time of trial. C.A.S. is also a healthy child who suffers from no special
medical conditions. C.L.S., another daughter, was born in November 1999; she was two at the time
of trial. She too is a healthy child. The Smiths' youngest daughter, C.R.S., was born in December
2000; she was two months old when she was removed from her home. At the time, C.R.S. required
an apnea monitor to monitor her breathing. After she was removed from her home, C.R.S. was
diagnosed with mild cerebral palsy and suffered from seizures.


The Department becomes involved

 The Department first became involved with the family in September 2000, when it
received a referral regarding S.R.H. and C.C.S. A Llano police officer observed the two girls, who
were eight and five respectively at the time, walking to school along a highway accompanied only
by a fifteen-year-old girl and informed the Department. Bobbie had left the girls in the care of
Carlos's mother, Beulah Smith, while Bobbie visited her grandmother, who was in an intensive care
unit in a San Antonio hospital. The two girls had missed the schoolbus and were walking to school
with the fifteen-year-old friend of the family when they were observed by the police. As a result of
the incident, the Department opened a case to initiate family-based services.

 In January 2001, the Smiths' case was assigned to Sabrina Harris, a Department
caseworker, who had been with the Department for less than a month. Harris's duties were to make
home visits, talk to the children at school, offer services to the family, such as parenting, individual
counseling, anger management, drug and alcohol assessments when necessary, and "to kind of
basically watch the family and try to preserve it as much as possible to prevent removals."

 Harris made her first home visit on January 25, 2001 during the middle of the
afternoon. All five children were home with Bobbie that day. Harris testified during the trial that
the inside of the house was filthy; the kitchen was infested with roaches and dirty dishes, and the
refrigerator was not working; there were clothes all over the living room; the front steps to the house
were unstable and missing boards; the yard was strewn with trash; windows were broken; the
children were dirty; the two older children were home from school because they had head lice; and
the children were running in and out of the house as they pleased, except for C.R.S., who was in a
baby carrier. Harris also testified that Bobbie, who had a month-old baby, appeared tired and
disheveled. Carlos was incarcerated at the time. Harris instructed Bobbie to clean up the house, and
said she would return in one week to check on Bobbie's progress. When Harris returned the
following week, she observed that the improvements she had requested were not made. Harris again
asked Bobbie to clean the house, and told her she would be back to check on her progress. 

 Before her next visit, Harris received a call from the principal of the two older girls'
school; he expressed concern about the girls' absences. Harris then returned to Bobbie's house to
discuss the absences. When she arrived, Bobbie was ill, so her mother answered the door. The
house did not look any better to Harris. In addition, the children were running in and out of the
house playing, and they were very dirty.

 On February 15, Harris visited the two older girls at their school. The girls informed
Harris that they had been staying with their paternal grandmother, Beulah Smith, so that they could
get to school on time. So, Harris went to Bobbie's house to find out why the girls were staying with
their grandmother. When she arrived, C.A.S. answered the door; he was four years old at the time. 
Bobbie was in her bedroom sleeping with the two younger girls; she never came out to speak with
Harris. Later that day, Harris learned that the police had made a safety and health check (1) at the house
earlier in the day. The police did not contact the Department to report any problems.

 Harris returned to the home on February 22. She brought a co-worker with her, Jackie
Morley Webb, to help her assess the family and the situation. Bobbie was home that day with her
three youngest children; the two older girls were at school. Bobbie appeared upset because Harris
had brought another person with her. At one point, Bobbie grabbed C.L.S. by her arm and dragged
her down the hall. C.A.S., the boy, was running in and out of the house with a broomstick trying to
"play fight," and both children were very dirty. Bobbie was yelling at her children to stop. After the
visit, Harris and Webb called their supervisor "to staff the case for removal." Harris's decision to
seek removal was based on her concerns about the condition of the house, the lack of supervision
for the children, the condition of the children, and safety hazards in the home. Harris's description
of the safety hazards included holes in the floor, exposed wiring, holes in the bathroom, cigarette
butts on the floor, clothes on the floor, trash on the floor, broken glass, the oven was open to heat
the home, and the home had no heat otherwise. Harris also mentioned as safety concerns the
proximity of the home to the highway and the fact that the door on the trailer did not have a lock. 

 Later that day, Webb picked up the two older girls from school. Harris, accompanied
by law enforcement, went to Bobbie's house to pick up the three younger children. Bobbie was
distraught and upset when Harris removed the kids. Carlos was incarcerated at the time. The notice
for emergency removal that Harris left with Bobbie when she removed the children states that the
reason for the removal was fire and safety hazards in the home, no cooperation with the Department,
and neglectful supervision of the children. The children were taken to the Department's office. 
According to Harris, the children were dirty, improperly clothed, hungry, and very thin. The two
older girls had very bad head lice. The children were cleaned up, fed, and taken to their placements.

 The following day, February 23, the Department filed its original petition for
protection of the children. On March 9, the trial court held a "fourteen-day" hearing and appointed
the Department as temporary managing conservator of the children. The trial court also ordered
paternity testing regarding the oldest child, S.R.H., and supervised visitation for the Smiths at the
Department's office twice a month. The court ordered the Smiths to (1) submit to and cooperate
fully in psychological evaluations, (2) attend and cooperate fully in counseling sessions, (3) attend,
participate in, and successfully complete parenting classes and to submit a certificate of completion
within seven days of completing the classes, (4) submit to and cooperate fully in drug and alcohol
dependency assessments, (5) submit urine samples at times requested by the Department for analysis
by a drug testing laboratory, and (6) comply with each requirement in the Department's service plan. 
The degree of the Smiths' compliance with the order is disputed. It is undisputed, however, that
Bobbie failed to participate in S.R.H.'s paternity testing.

 After the children's removal, caseworker Ellie Krueger was assigned to work on the
Smiths' case. She testified at trial that the Department's main goal during the initial phase is to
reunify the family and improve the situation. With that goal in mind, the first family plan was
prepared in March 2001. The family plan required the Smiths to have a drug assessment and to
refrain from criminal activity. They were also to attend anger management classes and parenting
classes, receive psychological evaluations, receive individual counseling, and maintain stable
employment and proper housing. Krueger was also concerned about Bobbie's depression and
encouraged her to get medication to combat the depression. Because the Smiths did not appear to
be making any progress in achieving their family service plan goals, in December 2001, the
Department amended its petition and sought termination of Bobbie and Carlos's parental rights. A
jury trial was held in July 2002, during which a jury heard from twenty different witnesses. The jury
found that the Smiths' parental rights to all of their children should be terminated, and the trial court
signed a judgment terminating the Smiths' parental rights. This appeal follows.


DISCUSSION


Preservation of factual sufficiency complaint

 As a preliminary matter, the Department urges that the Smiths have failed to preserve
their objection to the factual sufficiency of the evidence because they did not file a motion for new
trial. The Department argues that a motion for new trial is a prerequisite to bringing a factual
sufficiency complaint on appeal, even in cases involving termination of parental rights.

 A motion for new trial is a prerequisite to preserve a factual sufficiency of the
evidence complaint. Tex. R. Civ. P. 324(b)(2); Cecil v. Smith, 804 S.W.2d 509, 510 (Tex. 1991);
see also In re M.S., No. 02-0509, Tex. LEXIS 108, at *37 (July 3, 2003); In re A.F., No. 02-1167,
Tex. LEXIS 119, at *2 (July 3, 2003) (parties preserved factual sufficiency complaint by filing
motion for new trial). Whether a motion for new trial is required to preserve factual sufficiency
complaints in cases involving termination of parental rights, however, is an issue that has divided
the appellate courts. See In re J.F.C., 96 S.W.3d 256, 276 n.71 (Tex. 2002) (expressing no opinion
on the appellate courts' holdings on the issue). Recently, the supreme court held that the right to
counsel for indigent persons in parental-rights termination cases includes the right to effective
assistance of counsel. In re M.S., Tex. LEXIS 108, at *27. In considering whether counsel is
ineffective for failure to preserve a factual sufficiency complaint by filing a motion for new trial, the
court opined that the State's interest "in maintaining the familial bond versus its interest in
maintaining procedural integrity weighs in favor of permitting a factual sufficiency review when
counsel unjustifiably fails to" file a motion for new trial. Id. at *43. When evidence fails clearly and
convincingly to establish that parental rights should be terminated, the court recognized that a serious
risk of erroneous deprivation of parental rights exists, and the procedural rule governing factual
sufficiency preservation "must give way to constitutional due process considerations." Id. at *43-44. 
Although the supreme court discussed the rule governing factual sufficiency preservation in the
context of the right to effective assistance of counsel, we believe those principles aptly apply in this
case.

 It is undisputed that appellants failed to file a motion for new trial in this case, and
we are not presented with an ineffective assistance of counsel claim. Thus, unlike the supreme court
in In re M.S., we do not address whether appellants' counsel was unjustified in failing to file a
motion for new trial. The record reveals, however, that the Smiths did file a statement of points on
which they intended to appeal, in which they included their allegation that the evidence was factually
insufficient to support the jury's verdict. See Tex. Fam. Code Ann. § 263.405(b) (West 2002). 
While the statement is not a motion for new trial, it did apprise the trial court of the Smiths' factual
sufficiency complaint. Following the filing of this statement, the trial court was required to hold a
hearing no later than the thirtieth day after it signed its final judgment to determine whether it should
grant a new trial; this is so, even though the Smiths did not file a motion for new trial. See id. §
263.405(d). Given the supreme court's recent pronouncement regarding the importance of achieving
a just and accurate decision in termination of parental rights cases and the Smiths' filing of a
statement of points they intended to appeal, including a factual sufficiency point, we will review the
Smiths' factual sufficiency complaint.


Standard of review

 The natural right existing between a parent and child is of constitutional dimensions. 
Holick v. Smith, 685 S.W.2d 18, 20 (Tex. 1985). The United States Supreme Court has characterized
the right to raise one's child as essential--a basic civil right far more precious than property rights. 
Stanley v. Illinois, 405 U.S. 645, 651 (1972). Because the involuntary termination of parental rights
is complete, final, and irrevocable, termination proceedings must be strictly scrutinized. Holick, 685
S.W.2d at 20. 

 A court may terminate parental rights if it finds that: (1) the parent has engaged in any
of the specific conduct enumerated in the family code as grounds for termination, and (2) termination
is in the best interest of the child. Tex. Fam. Code Ann. § 161.001 (West 2002); Richardson v.
Green, 677 S.W.2d 497, 499 (Tex. 1984). A termination order must be supported by clear and
convincing evidence. Tex. Fam. Code Ann. § 161.001. "Clear and convincing evidence" means
"the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or
conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. §
101.007 (West 2002); accord In re C.H., 89 S.W.3d 17, 25 (Tex. 2002); In re G.M., 596 S.W.2d
846, 847 (Tex. 1980). The fact finder must determine that clear and convincing evidence supports
both elements; proof of one element does not relieve the burden of proving the other. Holley v.
Adams, 544 S.W.2d 367, 370 (Tex. 1976). 

 In deciding whether the evidence is factually sufficient, this Court reviews the record
to determine if the evidence is such that "a fact finder could reasonably form a firm belief or
conviction about the truth of the State's allegations." In re C.H., 89 S.W.3d at 25. A firm belief or
conviction is a standard short of that of beyond a reasonable doubt. Id. at 26. This standard retains
the deference that an appellate court must have for the jury's fact finding mission. Id. We are
mindful that the jury has the opportunity to view the demeanor of the witnesses throughout trial, and
its role is to weigh their testimony. In re W.E.C., 110 S.W.3d 231, 247 (Tex. App.--Fort Worth
2003, no pet.). The Department alleged seven statutory grounds for termination of the Smiths'
parental rights. See Tex. Fam. Code Ann. § 161.001(1)(D), (E), (F), (J), (N), (O), (P). Hence we
will affirm the termination of the Smiths' parental rights if there is sufficient evidence of any one
of the enumerated acts alleged by the Department and that termination is in the children's best
interest. 


Dangerous environment

 Sections 161.001(1)(D) of the family code provides that the trial court may terminate
the parent-child relationship if the court finds by clear and convincing evidence that the parents have
"knowingly placed or knowingly allowed the child to remain in conditions or surroundings which
endanger the physical or emotional well-being of the child." Tex. Fam. Code Ann. § 161.001(1)(D). 
In an involuntary termination proceeding, "endanger" means conduct that is more than a threat of
metaphysical injury or the possible ill effects of a less-than-ideal family environment. Texas Dep't
of Human Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex. 1987). It is not necessary, however, that the
child suffer physical injury for a finding of endangerment to be made. Id. Rather, endangerment
means to expose to loss or injury or to jeopardize. Id.; see also In re M.C., 917 S.W.2d 268, 269
(Tex. 1996); Leal v. Texas Dep't of Protective & Regulatory Servs., 25 S.W.3d 315, 325 (Tex.
App.--Austin 2000, no pet.), disapproved on other grounds, In re C.H., 89 S.W.3d 17 (Tex. 2002). 
Endangerment can occur through both the acts and omissions of the parent. Phillips v. Texas Dep't
of Protective & Regulatory Servs., 25 S.W.3d 348, 354 (Tex. App.--Austin 2000, no pet.). Under
this subsection, the child's environment must be the source of the endangerment to the child. In re
B.S.T., 977 S.W.2d 481, 484 (Tex. App.--Houston [14th Dist.] 1998, no pet.), disapproved on other
grounds, In re C.H., 89 S.W.3d 17 (Tex. 2002).

 Harris testified that during her first visit to the Smith home, she observed that the
inside of the house was filthy; the kitchen was infested with roaches and dirty dishes, and the
refrigerator was not working; there were clothes all over the living room; the front steps to the house
were unstable and missing boards; the yard was strewn with trash; and windows were broken. 
During her two subsequent visits, Harris did not observe any signs of improvement of the conditions. 
On February 22, the day that the children were removed from the home, Harris's description of the
safety hazards in the home included holes in the floor, exposed wiring, holes in the bathroom,
cigarette butts on the floor, clothes on the floor, trash on the floor, broken glass, the oven was open
to heat the home, and the home had no heat otherwise. She also mentioned as safety concerns the
proximity of the home to the highway and the fact that the door on the trailer did not have a lock.

 The children's guardian ad litem, Kay McCorquodale, also testified that when she
visited the Smith home in August 2001, the home "was a wreck" and "[n]ot suitable for children to
live in." She observed a broken window, garbage, clothes, and torn up furniture strewn around the
house, and the bathroom was "torn up." Outside, she saw an old refrigerator, an old water heater,
an old washing machine, and various junk. She testified that on her next visit, she observed that
many of the repairs had been made and the inside of the house was all right; however, the porch
needed to be finished and the junk in the yard needed to be cleaned out. She had not visited the
Smiths' current dwelling.

 Ellie Krueger testified that after she took over the case, she visited the Smith home
during the summer of 2001. Carlos was incarcerated at the time. She saw that improvements had
been made, but more were still needed. On her second visit, she saw more improvements had been
made. Specifically, a carpenter had built a porch onto the front of the home, and "made it really look
safe [b]ecause if a child would come out the front door of the manufactured home, they could, you
know, stay right there instead of going out into the yard." She still expressed concern with the
absence of screens on the windows and the "basic yard, the children didn't need to be running around
in because of hazards out there." Also, there was one spot on the kitchen floor that sank when
someone stepped on it. Although it appeared that someone had tried to repair it, it still sank. 
Krueger testified that she never saw any roaches in the home. She was still concerned about some
wires hanging from the wall and the risk they might pose for young children. When Krueger was
asked what still needed to be done to make the repairs to the Smith home complete, she replied that
the house needed a health and fire inspection. Krueger's last inspection of the Smith home took
place four months before a December 2001 permanency hearing, and she did not know what repairs
had been made since that time. When asked if the Smiths had completed the goal of repairing their
home, Krueger responded "[a]s much as they could within means." Krueger had not inspected the
Smiths' current home, which is a state-subsidized apartment.

 The Smiths do not dispute on appeal that their home was filthy and unkept at the time
of the children's removal. Bobbie Smith testified that she tried to combat the pest problem by using
a "bomb," bug spray, and roach motels. She also testified that she was generally tired from having
just had a baby and a tubal ligation. Bobbie testified that sometime in February, she moved in with
her mother-in-law Beulah Smith because she was told her home was not fit. When she discovered
that her youngest daughter required the use of an apnea monitor, which had to be hooked up to a
phone line, she returned to her trailer with the children because Beulah's home did not have a phone
line. Bobbie had maintained a phone line at her trailer because her father-in-law was staying on the
premises to repair the trailer. Bobbie testified that she intended to stay at the trailer only for a few
days until a phone line could be hooked up at Beulah's. She also testified that before returning to
the trailer, Bobbie called Harris to inform her that she would be returning to the trailer temporarily. 
(Although Harris confirmed that Bobbie indeed called her to tell her about the apnea monitor, she
disputes that Bobbie told her she was living with Beulah and would be returning to the trailer for a
few days.) It was during this temporary stay that the Department removed the children.

 After the children were removed, Bobbie embarked on a remodeling effort. She
testified that all the floors were remodeled; new carpet was installed in every bedroom; tile was
installed in the hallway, bathroom, and kitchen; windows were replaced; and everything was
generally cleaned up. With the help of her father-in-law, she made most of the repairs, and Carlos
finished them when he was released from the intermediate sanction facility. Bobbie provided
pictures of the newly remodeled home for the jury. She also testified that a fire and health inspection
was done, but had no documentary evidence to prove it. When the Smiths learned that the repairs
to the house were insufficient, they moved into a Section 8 apartment; that is, one subsidized by the
State.

 Carlos testified that just before he was sent to Llano County jail and then to the
intermediate sanction facility, he, Bobbie, and the children had been living in a house. After the roof
fell in at that house, the family moved to the trailer. Shortly after the move, Carlos was incarcerated. 
He testified that he was not very familiar with the conditions of the trailer because he was
incarcerated just after they moved into it. When he was released, however, he finished repairing it.

 While the testimony at trial establishes that the family was living in a less than ideal
environment, it does not rise to the level of clear and convincing evidence sufficient to establish
endangerment to the well-being of the five children. There is no evidence that the children were
malnourished or that conditions in the trailer were so unsanitary or inadequate so as to threaten the
children's health. Cf. In re M.C., 917 S.W.2d at 270. Moreover, the Smiths resolved their living
conditions by moving into a state-subsidized apartment. Accordingly, we hold the evidence is
factually insufficient to establish a violation of section 161.001(1)(D) of the family code.


Dangerous conduct

 Section 161.001(1)(E) provides that a parent's rights may be terminated if it is
established by clear and convincing evidence that the parent has "engaged in conduct or knowingly
placed the child with persons who engaged in conduct which endangers the physical or emotional
well-being of the child." Tex. Fam. Code Ann. § 161.001(1)(E). Under subsection (E), we look to
the parents' conduct alone, including actions, omissions, or the parents' failure to act. In re D.M.,
58 S.W.3d 801, 811 (Tex. App.--Fort Worth 2001, no pet.). The endangering acts need not have
been directed at the child, or have caused an actual injury or threat of injury to the child; the parent
need only have engaged in a course of conduct that endangered the child's physical or emotional
well-being. Id. Termination under this subsection must be based on more than a single act or
omission; a voluntary, deliberate, and conscious "course of conduct" by the parent is required. Id.
at 812. In its brief, the Department argues that Bobbie and Carlos engaged in conduct endangering
their children's well-being by (1) failing to tend to the children's medical needs, (2) failing to
adequately supervise the children, (3) neglecting the children's educational needs, and (4) engaging
in drug use, which in the case of Carlos, has resulted in incarceration.

 The youngest child, C.R.S., has special medical needs. She required the use of an
apnea monitor, was diagnosed with mild cerebral palsy, and suffered from seizures when she was
first placed in her foster home. In its brief, the Department contends that the Smiths "offered no
evidence that they gave [C.R.S.] the needed physical therapy to help reduce the effects of her
cerebral palsy." It is clear from the record, however, that Bobbie sought medical treatment for
C.R.S., as recently as the morning that C.R.S. was removed from her home. A few days before the
Department removed the children, Bobbie took C.R.S. to the hospital emergency room because she
had stopped breathing. A doctor there told Bobbie that C.R.S. needed an apnea monitor and that
Bobbie should contact a specialist. Bobbie contacted a specialist the following day; the specialist
told Bobbie that she would need a phone line in order to use the apnea monitor. So, Bobbie, who
had been staying with her mother-in-law at the time, moved back to her trailer because her mother-in-law had no phone line, but the trailer did. On the morning of February 22, the same day the
Department removed the children, a specialist, Dr. Forrester, came to Bobbie's home, showed her
how to work the apnea monitor, taught her CPR and what to do if the child began choking. A few
hours later, the Department came to visit Bobbie and shortly thereafter, returned to remove her
children. There is nothing in the record to suggest that C.R.S. had been diagnosed with or that
Bobbie had been aware of the cerebral palsy at that time. In fact, C.R.S.'s foster mother, Reba
Leming, testified that C.R.S. was not diagnosed with cerebral palsy until after she came into
Leming's care and Leming took her to a pediatrician, who diagnosed her. Leming, who is a
rehabilitative foster parent, testified that when C.R.S. arrived, she was not yet at the crawling stage,
and evidently there would have been no way to know up until that point to even check for cerebral
palsy.

 The Department also contends that Bobbie neglected S.R.H.'s, C.L.S.'s, and C.C.S.'s
medical needs. When S.R.H. arrived in her foster home, she had six bad teeth, according to Ruth
Fowler, her foster parent. S.R.H. cried when she tried to eat, and her teeth bled. Fowler took S.R.H.
to a dentist, who capped three of the teeth and removed three, two of which were abscessed. All six
teeth were baby teeth. Both S.R.H. and C.C.S. had recurring problems with head lice. Also,
Margaret Markham, C.L.S.'s foster parent, testified that when C.L.S. first arrived at her foster home,
she had ear infections and an ankle problem. A physician treated her ear infections, and an
orthopaedist has looked at her ankle. Finally, the Department asserts that the children were all
hungry, dirty, and very thin when they were removed from their home; C.L.S., for example, had milk
underneath her chin. The record includes no evidence, however, that the children were
malnourished, and in fact, Harris testified that she observed plenty of canned juices and food in the
kitchen cabinets during her visits. Also, Harris acknowledged that the children had been playing
outside before she came to remove them, and that they could have gotten dirty while playing.

 Bobbie testified that she "doctored" the lice problem, but it continued to persist. She
believed the girls were exposed to lice at their school, as none of her other children had the same lice
problem. She was not questioned about S.R.H.'s teeth or about C.L.S.'s ear infections and ankle
problem.

 The Department contends that the Smiths failed to supervise their children. It points
to the incident in which the two older girls were observed walking to school along a busy highway. 
Bobbie explained that she was in San Antonio for three days visiting her grandmother, who was in
a hospital intensive care unit, when her children were observed walking along the highway. The girls
were eight and five years old at the time. Carlos went to San Antonio to pick up Bobbie, and left the
children with his mother Beulah Smith. Beulah Smith testified that she was caring for the children,
but when she had to leave for work, she entrusted them to her son-in-law, who in turn entrusted them
to a family friend. When the two girls missed the school bus, the fifteen-year-old daughter of the
family friend walked them to school along the busy highway.

 In addition, during her initial visit, Harris observed the children running in and out
of the house as they pleased, unsupervised. When Harris returned for another visit, C.A.S., who was
four at the time, answered the door because Bobbie was asleep in her bedroom with the two younger
girls. C.A.S. was watching television, playing and running outside, unsupervised. Bobbie did not
recall a visit from Harris while she was sleeping. Harris also testified that on that day, the police had
visited Bobbie earlier and had made no report to the Department regarding the condition of the house
or the children. In addition, Harris admitted that Bobbie's father-in-law had been staying on the
Smiths' property in a camper; his wife, Beulah Smith, explained that he was there to make repairs
to the Smiths' home. Harris, however, did not see Mr. Smith on the day of her visit.

 Webb testified about the day she joined Harris for a visit to Bobbie's house on
another occasion. On that day, Bobbie was home with the three younger children. Webb testified
that at one point, they (presumably, Webb, Harris, and Bobbie) were standing outside on the front
porch while C.A.S. was swinging a broomstick or a piece of wood near them. Because no one told
the boy to put the stick down, Webb did so. She also observed that when C.R.S., the baby, was
crying, Bobbie did not tend to the baby, and after several minutes, Webb picked her up and
comforted her. In addition, as the three women were walking through the house, C.L.S. began
crying. Bobbie responded by grabbing the girl's arm and yanking her, just missing a piece of wood
in the hallway that could have hit C.L.S.'s head.

 McCorquodale testified that during her observation of the Smiths and their children,
she did not see anything that concerned her about the Smiths' parenting abilities, and they were able
to appropriately discipline the children.

 Regarding their educational needs, Ron Province, the principal of Llano Elementary
School testified about the older girls' attendance history and academic achievements. (2) According
to Province, S.R.H. enrolled in kindergarten in August 1997, withdrew in November, re-enrolled in
December, and withdrew again in February 1998. (3) S.R.H. returned to kindergarten the following
school year, enrolling in the fall of 1998. Of 180 total days in the school year, S.R.H. missed 43
days. Consequently, she was assigned to mandatory summer school to make up some of the
absences. She was pretty much on level in kindergarten, and after she completed summer school,
she was promoted to first grade. During her first grade year, S.R.H. was absent 48 days of the 180-day school year. At the end of her first grade year, S.R.H. was not recommended for promotion to
the second grade, due in part to the excessive number of absences and the amount of instruction that
she had missed. She was nevertheless promoted to the second grade and enrolled in the fall of 2000;
she was officially withdrawn on March 4, 2001. (S.R.H. was removed from her home on February
22, 2001.) Of the 90-day period during which she was enrolled, S.R.H. was absent 33 days. 
Although she had begun the school year performing well, by the time she was withdrawn, S.R.H.
was failing in all of her subjects. C.C.S. enrolled in kindergarten in the fall of 2000 and was
withdrawn March 5, 2001. She had 41 absences during that time period. She was performing
satisfactorily in all her academic areas. Province testified that neither child exhibited discipline
problems and both were "great" and loveable kids.

 Province testified that he did not know the reason for the girls' excessive absences. 
He acknowledged, however, that at least some of them were due to the girls' problems with lice. 
According to Province, once lice is discovered on a child, the child's parents are contacted and the
child is sent home. Before the child can return to the school, he or she must be examined by the
nurse, who checks for live and moving lice.

 Province also testified about his interaction with Bobbie. He characterized her as
cooperative and always willing to talk with him. He "never felt like she was not trying;" he just felt
that "she couldn't do whatever it was we were asking her to do."

 Bobbie testified that some of S.R.H.'s absences were due to appointments with the
eye doctor. In addition, Bobbie kept S.R.H. home for about a week because her glasses were broken,
she could not see, and her eyes hurt. Bobbie also stated that S.R.H. was often sent home because
of lice or nits in her hair. So, Bobbie took S.R.H. out of Llano County elementary school and
enrolled her in Burnet County elementary school; she did not specify when she did this, however. 
She also stated that on occasion, she had to go out of town, and took the children with her. And
sometimes the absences were because she was trying to care for five children, two of whom were
babies, while her husband was incarcerated.

 The Department contends that the Smiths' drug use and incarcerations endangered
the children. Michael Okolo, Bobbie's probation officer, testified that Bobbie was placed on
probation in May 2001 for possession of cocaine; she will complete probation in May 2004. One
of her conditions of probation is drug treatment, although Okolo was still trying to find a drug
treatment program for her. In addition, Bobbie is required to submit to random urinalysis tests. The
first one that Okolo scheduled was on October 17, 2001. When Bobbie arrived for the test, Okolo
instructed her to wait for him in the lobby. When he returned to the lobby to retrieve her, Bobbie
was gone and did not submit to the test that day. Okolo tested Bobbie in June 2002, and she tested
positive for cocaine. The next time he tried to conduct a urinalysis test was on July 9, 2002; he
tested Bobbie for cocaine, marihuana, methamphetamine, PCP, and amphetamine. Bobbie tested
clean. 

 Sometime after October 2001, Okolo filed a motion to revoke Bobbie's probation
based on the offenses of hindering apprehension and making a false report to a peace officer. The
outcome of that motion to revoke and the underlying offenses is unclear from the record. Okolo
testified that Bobbie's probation was continued, and she was not revoked. She was ordered,
however, to spend 75 days in the county jail, but she was given credit for time served; she was also
ordered to complete outpatient treatment. Okolo was not aware of what, if anything, happened with
the hindering apprehension and making a false report to a peace officer allegations. Bobbie testified
that she was found not guilty on those charges.

 Darrell Slaughter testified about the day that Bobbie showed up on his doorstep with
S.R.H. in 1997. She showed up one evening in either late summer or early fall and told Darrell that
S.R.H. was his daughter, that she could not take care of her right then, and that Darrell needed to do
so. Darrell testified that Bobbie was "without a doubt messed up on drugs, wired to the gills." 
Bobbie wrote a note giving Darrell and his wife temporary custody of S.R.H. At the time, S.R.H.
was, according to Darrell, "plumb full of head lice and just as filthy as could be." Darrell and his
wife took care of S.R.H. and enrolled her in school; she lived with them for about four months. 
Then, one night, Bobbie showed up at Darrell's doorstep at about 3:00 a.m., asking to see S.R.H. 
According to Darrell, Bobbie had fresh track marks on her neck and was "[w]ound up like a nine-day
clock." Bobbie wanted to take S.R.H., but Darrell would not let her. The next day, S.R.H. did not
return home from school. Bobbie testified that she left S.R.H. with Darrell Slaughter because Carlos
was incarcerated and she "couldn't handle things right then."

 Bobbie also testified that she has done drugs since the age of eleven. She stated that
she no longer uses drugs and does not plan to start using them again. According to Bobbie, she was
never an addict, never used drugs around her children or in the home, and the use of drugs never
affected her parenting abilities, but she did once leave her family and used drugs, entrusting the
children to Carlos. She said that if her children were returned to her, she would commit herself to
a drug treatment facility.

 Gaylene Simpson, Carlos's probation officer, also testified. According to Simpson,
Carlos was placed on probation for possession of a controlled substance and delivery of marihuana. 
Simpson testified that in early 1996, Carlos tested positive on a urinalysis, causing his probation
officer to require weekly reporting. He again tested positive in the summer of 1996. He had a few
more positive urinalysis test results in the fall and winter of 1996, causing Simpson to file a motion
to revoke. That is when Carlos agreed to a modification of his probation, and he was ordered to
SAFPF in February 1997. After he was released from SAFPF, Carlos had two more positive
urinalysis tests, and a couple of negative ones. As a result, Simpson filed another motion to revoke,
and Carlos agreed to a modification of his probation, by which he was ordered to the intermediate
sanction facility. Carlos was transferred to the intermediate sanction facility in February 2001, and
was to stay there for a year. But in October 2001, after his children were removed, Carlos petitioned
for an early release, and the court granted it. Since his release, he has had no more dirty urinalysis
tests. 

 In sum, evidence of Bobbie's failure to supervise her children or tend to their medical
needs does not alone rise to the level of clear and convincing evidence sufficient to establish a
voluntary course of conduct that endangers the physical and emotional health of the children. Bobbie
sought counseling for S.R.H. when she was sexually assaulted, and she sought the necessary
treatment for C.R.S. when she discovered that the baby needed to have her breathing monitored. 
Although the two older girls were often plagued with lice, Bobbie attempted to treat the problem. 
Indeed, if she had not, the girls would never have been allowed to return to school. And although
Bobbie's exercise of poor judgment may have resulted in her two girls walking along a busy highway
with a teenager, there is no evidence that Bobbie or her mother-in-law, Beulah, was aware of or
approved of the occurrence and no evidence that the incident occurred again.

 When this evidence is coupled, however, with the evidence demonstrating Bobbie's
failure to ensure that her two older girls were attending school and both Bobbie's and Carlos's use
of drugs and their resulting incarcerations, we cannot say that a reasonable fact finder could not have
formed a firm belief or conviction that the children were endangered by the Smiths' conduct. (4) 
Although both Bobbie and Carlos asserted that they never used drugs around the children, there is
some evidence that Bobbie was under the influence of drugs when she left S.R.H. with Slaughter. 
Moreover, one parent's drug-related endangerment may be imputed to the other parent. Edwards
v. Texas Dep't of Protective & Regulatory Servs., 946 S.W.2d 130, 138 (Tex. App.--El Paso 1997,
no pet.).

 Further, Carlos's use of drugs resulted in his absence from the family, leaving the
children in Bobbie's care. Imprisonment, standing alone, does not constitute "engaging in conduct
which endangers the emotional or physical well-being of the child." It is a fact properly considered,
however, on the issue of endangerment. Boyd, 727 S.W.2d at 533-34; In re D.T., 34 S.W.3d 625,
635-36 (Tex. App.--Fort Worth 2000, pet. denied); In re B.S.T., 977 S.W.2d at 485. The
Department need not show incarceration was a result of a course of conduct endangering the child;
it need only show incarceration was part of a course of conduct endangering the child. Thus, if the
Department proves that incarceration was part of a course of conduct that has the effect of
endangering the child, the requirement of subsection E is met. Boyd, 727 S.W.2d at 533-34. In this
case, the evidence proves that Carlos's incarceration due to his drug use and Bobbie's drug use are
part of a course of conduct endangering their children. See In re D.M., 58 S.W.3d at 813. 

Failure to comply with court order

 Although we have determined that factually sufficient evidence demonstrates that
both Carlos and Bobbie engaged in a course of conduct endangering their children, we have also
reviewed the evidence regarding the parents' compliance with the trial court's order. Section
161.001(1)(O) provides that the court may order termination if it finds by clear and convincing
evidence that the parents


failed to comply with the provisions of a court order that specifically established the
actions necessary for the parent to obtain the return of the child who has been in the
permanent or temporary managing conservatorship of the Department of Protective
and Regulatory Services for not less that nine months as a result of the child's
removal from the parent under Chapter 262 [Procedures in Suit by Governmental
Entity] for the abuse or neglect of the child. 



Tex. Fam. Code Ann. § 161.001(1)(O). On March 9, 2001, following an adversary hearing the trial
court signed temporary orders, which required the Smiths to comply with a number of provisions in
order to obtain the return of their children. Among those provisions were the following: the parents
were (1) to submit to a psychological evaluation, (2) to attend counseling sessions, (3) to attend and
successfully complete parenting classes, (4) to submit to a drug and alcohol dependency assessment,
including urinalysis testing, and (5) to submit to and successfully complete a substance abuse
treatment program. The court also ordered paternity testing for S.R.H. On January 28, 2002, the
trial court signed a permanency hearing order, by which the court continued all previous orders
issued by the court but made the following modifications: further paternity testing for S.R.H. was
not necessary and so that requirement was waived, and Carlos was ordered to begin paying child
support in the amount of $100 per month.

 It is undisputed that Bobbie failed to participate in a paternity test. She testified that
she attempted to submit to the test on two separate occasions, but was unsuccessful. On her first
attempt, she was told she could not have the test done without an appointment. So, the Department
scheduled an appointment for her. When she returned at the appointed time, she was told she needed
proper identification, which she did not have. Once it was confirmed that Darrell Slaughter was
S.R.H.'s biological father, the court modified its order eliminating the requirement that Bobbie
submit to the paternity test. Curiously, the record reveals that the trial court later reinstated the order
compelling Bobbie to submit to a paternity test. On July 8, 2002, the trial court granted the
Department's motion for contempt and found Bobbie in contempt for failing to submit to genetic
testing.

 It is also undisputed that Carlos failed to pay the court-ordered child support. Carlos
testified that he intended to pay the child support, but he was trying to catch up on debts accumulated
while he was in the intermediate sanction facility. On appeal, he argues that he was unaware that
his rights might be terminated for failure to pay child support.

 In addition to these provisions, the record contains evidence demonstrating that
although the Smiths complied with some of provisions in the court order, they failed to comply with
all of the provisions. Krueger testified that both Bobbie and Carlos had submitted to psychological
evaluations. She also testified that the Smiths were frustrated and angry "about how do I do it
[comply with the family service plan]"; they did not know how to move on and work with the
Department. They tried to talk to Krueger during their visits with the children, but she informed
them that the time was inappropriate and encouraged them to set appointments.

 Bobbie testified that when she was ordered to participate in counseling, she found a
counselor and paid for the sessions herself. Bobbie's counselor, Bobbie Strickland, testified that she
saw Bobbie about five or six times for fifty-minute individual counseling sessions, beginning in
February 2000; they mostly discussed parenting skills. Strickland stated that they were unable to
meet as regularly as she would have liked because Bobbie often set up counseling sessions and either
would call to cancel her appointment or would simply not show up. Strickland testified that she
recalled Bobbie suggesting that money, work, and transportation issues prevented her from making
all of her appointments. She also testified that she knew Bobbie had a new job and that she could
not miss work in order to attend counseling. She characterized Bobbie as fair when asked how
successful Bobbie had been in gaining the necessary skills. Because they were unable to meet
consistently, however, Strickland did not believe that Bobbie had sufficiently improved on her
parenting skills to send her children home.

 As for parenting skills classes, Bobbie testified that she enrolled in two separate
parenting classes. She claimed to have attended parenting classes at Buckner Ranch for about six
weeks, and then went to parenting classes at Burnet Child Protective Services offices between two
and four times. She also enrolled in anger management classes but was kicked out when she
expressed an opinion that angered the instructor. Krueger, however, testified that although Bobbie
did try to attend parenting classes at Buckner Ranch, she did not complete the session. According
to Krueger, Buckner Ranch had a policy that if a parent missed one class, she could not finish the
session. Bobbie missed a class and was not allowed to finish the session. Krueger testified that
Bobbie had asked her to set up the parenting classes again, but it seems Bobbie did not complete
them.

 Bobbie testified that initially she was told the Department did not have the funds to
pay for her drug assessment or urinalysis tests, and she would have to pay for them herself. Krueger
later testified that Bobbie eventually submitted to a drug assessment as ordered, but did not complete
a drug treatment program.

 Carlos Smith does not dispute that he has not participated in individual counseling. 
He went to one counseling session, but was incarcerated and could not attend the counseling sessions
Krueger had set up for him. He, however, testified that he completed everything else that was
included in the Department's family service plan. He took parenting classes while he was in SAFPF
and anger management classes while in the intermediate sanction facility, as well as some other
classes such as life skills and job readiness. Although he took the parenting class while he was in
SAFPF, which was before he was ordered to, Carlos testified that he did not think it made any
difference. 

 Krueger, on the other hand, testified that the parenting class that Carlos claims to have
completed was taken too long ago, back in 1997 or 1998. And, Krueger was not certain that the class
included all of the things that a parenting class taught by Child Protective Services would have
included. She also requested that Carlos repeat some of the classes he had taken while in the
intermediate sanction facility, explaining that "it would not harm him in any way to repeat them if
that is what had to be done." She complained that although she initiated two counseling sessions
for Carlos, he attended only one. In addition, he failed to inform her when Bobbie was incarcerated. 
And he never completed a drug assessment, although Krueger was not aware if he had completed
one as part of his probation. Nevertheless, when asked during the December permanency hearing
by the attorney representing the Department, "What do you think specifically Mr. Smith has done
that would justify termination," Krueger answered, "I cannot say that he has done anything to
terminate." Later during that hearing, when asked to provide a letter grade to rate Carlos's
compliance with the family service plan, Krueger answered, "B plus." 

 In sum, the evidence establishes that Bobbie failed to comply with virtually all of the
provisions in the trial court's order. As for Carlos, the evidence is not as compelling. Carlos
completed several classes, including anger management classes. He attempted to obtain his GED,
but was unsuccessful. While he attended only one counseling session, Krueger had set up only two
appointments. He obtained suitable housing and submitted to urinalysis tests through his probation
officer. He has consistently remained employed, although he changes jobs frequently. While he has
not satisfied his child support obligations, he testified that he is attempting to catch up on his
financial obligations. The record reveals that Carlos has at least made progress in satisfying all of
the provisions included in the trial court's order. Indeed, Krueger herself admitted in December
2001 that he was doing well. 

 Because we have already concluded that clear and convincing evidence supports the
allegation that Bobbie and Carlos engaged in a course of conduct that endangered their children, we
need not determine whether the evidence relating to compliance with the trial court's order is also
clear and convincing. We nevertheless find the evidence relevant as it relates to the best interests
of the children, which we discuss below. We overrule the Smiths' first two issues.


Best interest of the children

 By their third and fourth issues, the Smiths argue that the evidence is factually
insufficient to establish that termination is in the best interest of the children. See Tex. Fam. Code
Ann. § 161.001(2). Factors to be considered by a court in determining the best interest of a child
include: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the
future; (3) the parental ability of the individuals seeking custody; (4) the programs available to assist
these individuals to promote the best interest of the child; (5) the plans for the child by these
individuals or by the agency seeking custody; (6) the stability of the home or proposed placement;
(7) the acts or omissions of the parents that may indicate that the existing parent-child relationship
is not a proper one; and (8) any excuse for the acts or omissions of the parent. Holley v. Adams, 544
S.W.2d 367, 371-72 (Tex. 1976). The court is not required to consider all of the listed factors or any
unique set of factors; it may also consider additional factors. Id. at 372.

 The children did not testify at the trial, and thus, did not disclose their desires. As for
their physical and emotional needs, each of the children's counselors and foster parents testified at
trial. Carolyn Garner, S.R.H. and C.C.S.'s counselor, had been counseling the two girls from
September 2001 through May 2002. Throughout their course of therapy, the girls never indicated
that they had been abused or neglected by their parents. S.R.H. was also attending group therapy to
address her prior sexual abuse. According to Fowler, her foster parent, S.R.H.'s needs include
continued therapy to address her sexual abuse, dental care, and vision care. Both girls need
maintenance to prevent the lice problem, and continued assistance with their schoolwork.

 Gene Hartin, C.A.S.'s counselor, testified that he has seen C.A.S. more than fifty
times for counseling; he began seeing C.A.S. when he was about five years old. His initial
observations of C.A.S. were that he lacked basic communication skills and experienced
developmental delays. After about eighteen months, Hartin has noticed considerable progress. 
C.A.S. speaks clearly now and has improved his ability to express himself. Hartin opined that
C.A.S.'s early life was "somewhat like living in a large closet with very little stimulation and
interaction with others," making it difficult for him to learn how to express himself. Hartin further
opined that all the therapy in the world would not help C.A.S. without exposure to "as much activity,
to as much human interaction, to as much family interaction, to as much eating around the supper
table, people reading to him when he goes to bed. Constant conversation with him." C.A.S. also
takes Adderall to help him pay attention in school. 

 C.R.S. has special needs related to her cerebral palsy and respiratory problems. 
Specifically, C.R.S. needs continued therapy, speech therapy, and medication for her seizures. Her
therapy is currently being provided everyday by her rehabilitative foster parent, Leming. An early
intervention program provided someone to show Leming how to administer that therapy, but Leming
testified that C.R.S.'s parents could also administer therapy if shown the proper techniques. C.R.S.
also sees a neurologist for her seizures, an ear, nose, and throat specialist, and a pediatrician. Her
condition has improved, and she is now walking.

 It is undisputed that the children's counselors would still be available to assist the
children if they were returned to their home. As for future plans for the children, Krueger testified
that if the Smiths' parental rights were terminated, the Department would seek adoption with the
goal of keeping the children together. If the Smiths' rights were not terminated, the Department
would seek permanent managing conservatorship.

 In addition, Margie Markham, C.L.S.'s foster parent, stated that she and her husband
were interested in adopting C.L.S. She also stated that "if [the Department] would like to move the
other children into our home, that that would be acceptable also." She stated that the other children
"are welcome to come and see if a relationship would develop."

 Darrell Slaughter also expressed an interest in taking custody of S.R.H. and adopting
C.C.S. if the chance arose. Slaughter has a criminal record that includes assault and public
intoxication. He testified, however, that he has turned his life around and would do whatever is
required for the children's best interest. He has two other children, a steady job, and a stable home. 

 Although C.A.S.'s foster parent and C.R.S.'s foster parent were not interested in
adopting the Smith children, both indicated that they were willing to take care of the children on a
long term basis. 

 McCorquodale testified that she believed the children would be better off if they were
adopted. She thought that Carlos was sincere in his efforts to try to have the children returned to
him, but Bobbie did not want them badly enough to do what she needed to do.

 Beulah Smith, Carlos's mother, testified that she would be willing to help Carlos care
for the children if they were returned to him and if Bobbie committed herself to a drug treatment
facility.

 In sum, the children are currently in stable environments, and all of their needs are
being satisfied. We hold the evidence is factually sufficient to support a finding that termination of
the Smiths' parental rights was in their children's best interest.


CONCLUSION

 Having concluded that the evidence is factually sufficient to support the jury's
findings, we overrule the Smiths' issues on appeal and affirm the trial court's judgment terminating
their parental rights.



 

 Jan P. Patterson, Justice

Before Justices Kidd, Patterson and Puryear

Affirmed

Filed: September 11, 2003
1. Harris described a safety and health check as follows: 


That's where law enforcement is called by a party who is concerned in the
community or an agency, and they go and they knock on the door and they ask
to enter the home and check on the children and check on the parents and make
sure that everything is okay and that there's nobody injured and that there's food,
and to make sure that basically things are in some kind of order and that there's
supervision of the kids.


The police are required to report any suspected child abuse or neglect.
2. The Department listed the Smiths' failure to keep their children enrolled in school as an
additional basis for terminating their rights. See Tex. Fam. Code Ann. § 161.001(1)(J)(i). The
evidence adduced at trial, however, does not demonstrate that the children were not enrolled in
school. Rather, they were enrolled, but did not attend regularly.
3. Under the education code, a child does not have to be enrolled in school if he or she is
under the age of six. Tex. Educ. Code Ann. § 25.085 (West Supp. 2003).
4. Under section 161.001(1)(P), a parent's rights may be terminated if clear and convincing
evidence establishes that the parent "used a controlled substance . . . in a manner that endangered
the health or safety of the child, and: (i) failed to complete a court-ordered substance abuse treatment
program; or (ii) after completion of a court-ordered substance abuse treatment program, continued
to abuse a controlled substance." Tex. Fam. Code Ann. § 161.001(1)(P). The record reveals that
Bobbie did not complete a substance abuse treatment program. It is unclear whether Carlos's
commitment to the intermediate sanction facility constitutes a drug abuse treatment program. He
has not tested positive for drugs since his release. We nevertheless hold that his use of drugs
constitutes conduct that endangers his children.